**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **JONES LANG LASALLE AMERICAS, INC.,** | |
| **Plaintiff/Counter-Defendant,** | **Case No. 20-cv-05936** |
| **v.** | **Judge Jorge L. Alonso** |
| **MATTHEW POWERS,** | |
| **Defendant/Counter-Plaintiff.** | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff and counter-defendant Jones Lang Lasalle Americas, Inc. ("JLL") has moved for summary judgment on its claim as well as all of defendant and counter-plaintiff Matthew Powers' ("Powers") counterclaims. JLL asserts that Powers entered into a Promissory Note (the "Note") and accepted a loan payment from JLL, but that breached the agreement by refusing to repay the outstanding balance due. Powers asserts counterclaims against JLL for breach of contract, tortious interference and unpaid wages under Massachusetts law. For the reasons that follow, JLL's motion for summary judgment is granted in part and denied in part.

## I. BACKGROUND[1]

JLL is a real estate services corporation that purchases, constructs, occupies, and invests in a variety of assets including industrial, commercial, retail, residential and hotel real estate. JLL works across multiple industries, including banking, energy, healthcare, law, life sciences,

---

[1] The facts set forth in the "Background" section are undisputed by the parties unless otherwise noted. JLL's Rule 56.1(A)(3) Statement of Material Facts (ECF No. 60) shall be referred to herein as "PSOMF," while Powers' Rule 56.1(b)(3) Statement of Additional Material Facts (ECF No. 68) shall be cited to herein as "DSOMF."

manufacturing, and technology.

In 2015, Matthew Daniels, a managing director of JLL's brokerage team, introduced Powers to Mr. Tierney, the Market Director for JLL's New England Region, as a potential recruit for JLL's Boston office. At the time, Powers worked for MilliporeSigma as its head of real estate and strategy in its bioscience division. William Barrack, JLL's Executive Managing Director, also had a hand in recruiting Powers. Later that year, JLL hired Powers as a commercial real estate broker in the hopes of establishing a stronger presence in the life sciences real estate industry and that Powers' relationships with MilliporeSigma would translate into future opportunities.

### A. The Note

On June 1, 2015, JLL and Powers executed a Promissory Note (the "Note"). Pursuant to the terms of the Note, JLL made a one time, $500,000 loan to Powers and agreed to forgive the loan at a rate of 5% per dollar of revenue credit attributable to Powers for calendar years 2015 through 2017, and 8% per dollar of revenue credit attributable to Powers for calendar years 2018 through 2021. If the loan was not forgiven by December 31, 2021, or if Powers resigned or was terminated for "Cause" under Powers' employment agreement ("Employment Agreement") prior to repayment, any remaining balance plus accrued interest would immediately become due and payable. (PSOMF ¶ 14.) Additionally, JLL was entitled, "consistent with applicable state and federal laws[,] to (i) set-off any and all amounts due to [Powers] from [JLL] . . . without limitation . . . against the amount due from [Powers] under the Note, and (ii) withhold payment of any such amount to [Powers]." (*Id.* ¶ 15; Compl. Ex. A ¶ 2, ECF No. 1-1.)[2]

---

[2] Powers admits that this accurately recites a term of the Note, but disputes whether the provision was legally enforceable. (Def. Resp. to PSOMF ¶ 15, ECF No. 67.) Powers does not appear to argue that the provision is per se unenforceable, but rather that the manner in which JLL applied

### B. The Employment Agreement

Powers and JLL entered into the Employment Agreement on October 26, 2015. The terms setting forth Powers' compensation are central to this case. Exhibit A of the Employment Agreement outlines the commission structure and the payments attributable to Powers. Specifically, JLL agreed to pay Powers commissions consistent with its compensation plan ("Compensation Plan") and attributed revenue calculated at the following percentages: $0 to $500,000, 50% commission: $500,001 to $750,000, 55% commission; and $750,000 and above, 60% commission. Exhibit A further provides, "Commission percentages are calculated against revenue attributed to Employee. Revenue will be attributed from commissions or other fees the Company actually receives, less third-party payments such as outside co-brokerage fees or client fee-sharing, if such revenue is be [sic] recognized as income consistent with the Company's regular accounting practices." (PSOMF ¶ 22.) Per the Employment Agreement, "revenue for any and all commercial real estate activities in which [Powers] is involved during the Term of this Agreement belong to Company and [Powers] will be paid [Powers'] share of that revenue consistent with this Agreement." (*Id*. ¶ 20.)

By its terms, Powers' employment was deemed "at will" and JLL could terminate Powers' employment at any time, with or without notice or "Cause." Section 5 defines "Termination with Cause" as "Employee's: (i) material breach to a provision of this Agreement; (ii) sustained underperformance or refusal to perform the duties assigned under this Agreement; (iii) material breach to the Company's Code of Business Ethics or other written policies." (*Id*. ¶ 18.) Section 5 further provides that "provided that 'Cause' is able to be cured, 'Cause' shall exist

---

a setoff failed to comply with the Massachusetts Wage Act, which is addressed below in the "Discussion" section.

only after delivery by the Company to Employee of written notice setting forth material breach, underperformance or refusal to perform, as the case may be, and Employee's failure to cure to the Company's satisfaction within thirty (30) days after receipt of such notice. If the Cause is not curable, as determined in the Company's sole discretion, no notice is required and the Company can immediately terminate Employee." (*Id*. ¶ 19.)

Finally, the Employment Agreement "is governed by the laws of the State of Massachusetts." (Compl. Ex. B ¶ 11.)

### C. Compensation Plan

The Compensation Plan provides, "Each Broker's compensation is comprised of (a) base compensation (draw and/or salary) and (b) commissions based on receipt of revenue generated by Broker and subject to reconciliation based on adjustments." (PSOMF ¶ 28.) The manner in which JLL attributes revenue credit to a broker such as Powers and calculates corresponding commissions is set forth in the Compensation Plan as follows:

> Revenue credit is attributable to Broker consistent with that Broker's participation in generating the revenue, as determined by agreement of the team members for the transaction generating the revenue, subject to modification and approval by Markets Leadership to ensure reasonable and equitable distribution. Revenue credit is recognizable for the purpose of commission calculations once JLL receives the revenue fee, provided there is documentation consistent with the Company's regular practices to allow for recognition of the revenue. Broker does not earn a commission, and JLL has no liability for payment, unless and until JLL receives the fees for the respective transactions.

(PSOMF Ex. E ¶ 1(c).)

Under the Compensation Plan, brokers are not eligible for any commission payment for any transactions where payment is received by JLL one year after the broker's employment termination date. In the event of a termination with "Cause," the broker does not earn, is not eligible for and will not receive any compensation, in the form of commissions or otherwise, for

4

revenue relating to transactions that are pending on the termination date and that are not yet closed. (PSOMF ¶ 30; *id*. Ex. E ¶ 2(c)(i).)

### D. Internal Fee Splits, Allocations, and Dispute Resolution

Commissions are sometimes subject to an internal split process among the brokers involved in a deal. Such fee splits can be determined by a series of factors, including JLL guidelines, the Compensation Plan, and brokers amicably reaching agreements.

JLL contends that when a fee split is not agreed upon, brokers may present the dispute to a "neutral arbitrator" within the company. (PSOMF ¶ 26.) A business leader at JLL takes on the arbitrator role. (*Id*. ¶ 27.) Powers maintains, however, that no effort is made to screen for potential conflicts aside from ensuring the business leader is not personally seeking a part of the fee. Powers further posits that the process is not intended to resolve commission disputes fairly, but instead to dissuade brokers from challenging fee splits. Nonetheless, it is undisputed that JLL maintains written guidelines, applicable to all of JLL's business lines, that allow for the business leader in the arbitration role to take every deal's unique elements into account.

While brokers are paid their commissions upon receipt of cash revenue, there may be delays when fee splits have yet to be determined. In such situations, the revenue is placed into a "holdback account." (*Id*. ¶ 29.)

### E. Relationship Between Powers and Mr. Daniels

During Powers' employment with JLL, Mr. Daniels was both his manager and a broker that transacted business. Powers and Mr. Daniels did not see eye to eye in a number of ways. As part of Mr. Daniels' managerial responsibilities, he oversaw compensation splits and inbound business. Powers maintains that Mr. Daniels was able to personally benefit from those decisions by securing for himself a split of the revenue credit from the brokers he managed. JLL, for its

5

part, contends that Mr. Daniels' testimony refutes the fact that he personally benefited from each deal. Specifically, a portion of all inbound business revenue was set aside for JLL's benefit and split equally for end of year bonuses regardless of who worked on the deal in an attempt to make inbound business fairer.

Powers further asserts that Mr. Daniels had a "very threatening demeanor and 'made it very clear that if I did not do what he had hoped or if I did not include him in commission splits in a manner he would like, that there would be punitive measures for that.'" (DSOMF ¶ 5.) It was Powers' impression that Daniels "had basically unmatched authority in his role" and that he could "certainly diminish your income, business opportunities, and even terminat[e . . .] employment if you challenged his authority." (*Id*. ¶ 6.) Powers points to several incidents on deals between 2017 and 2018 as examples.

### F. The 2017 Portfolio Sale

In late 2017 a disagreement arose between Powers and Mr. Daniels concerning revenue credit on a sale of properties for MilliporeSigma located at 900 Middlesex Turnpike, Billerica, Massachusetts, and 1 and 3 Strathmore Road, Natick, Massachusetts ("Portfolio Sale"). Powers contends that although Mr. Daniels had not represented MilliporeSigma in the Portfolio Sale, Mr. Daniels insisted over Powers' objections that Powers give him a significant portion of the revenue credit. JLL, on the other hand, points out that Mr. Daniels procured Spaulding & Slye ("SSI") as a buyer.

In any event, Mr. Daniels emailed Powers stating he (Mr. Daniels) would take 35% but if not accepted he would "push for 40 percent… of which I believe I am entitled and will get in arbitration" before Mr. Tierney and Mr. Barrack. (DSOMF Ex. D at Ex. 2, p. 2.) From Powers' point of view, Mr. Daniels threatened Powers with an unfair arbitration process that he implied

would result in Powers losing even more revenue credit than Mr. Daniels was seeking. JLL

frames the situation as Mr. Daniels being willing to accept a lesser amount in an effort to avoid

arbitration on the issue.

In late 2017 or early 2018, Powers brought his concerns regarding Mr. Daniels's behavior

on the Portfolio Sale to Mr. Tierney. According to Powers, Mr. Daniels also engaged in unethical

practices such as failing to disclose conflicts of interest and failing to safeguard confidential

information. Powers asserts that employees within the Boston office would contrast "legitimate

deals" with "Matt Daniels deals," implying the latter would have some illegitimacy to it.

(DSOMF ¶ 12.) For example, Powers contends that Mr. Daniels "tried to essentially bribe

Powers with special benefits" if Powers steered the Portfolio Sale to SSI, an affiliate of JLL in

which Daniels was an investor. (*Id*. ¶ 13.) Powers points to a February 23, 2017, email from Mr.

Daniels to Powers stating: "FYI Lots of reasons to get this deal done. Let's make a win win for

everyone. MS…SSI and our families." (*Id*. Ex. J at JLL0000886.) JLL disputes Powers' framing

of Mr. Daniels' email as a "bribe[,]" stating that the emails merely explain the opportunities

available. (Resp. to DSOMF ¶ 13, ECF No. 71.)

### G.  The 2017-2018 Quanterix Lease Deal

Shortly thereafter another fee split disagreement arose between Powers and Mr. Daniels.

In connection with SSI's acquisition of 900 Middlesex Turnpike, it engaged JLL to serve as its

broker to find a tenant. This type of engagement on behalf of a landlord is known as an

"agency," and the parties refer to this specific agency engagement as the "Quanterix Lease

Deal." Powers contends that in agency engagements, decisions concerning revenue are typically

made at the outset and more weight is given to the individual responsible for sourcing the

engagement. (DSOMF ¶ 16.) JLL disputes that such fee splits and revenue decisions are common

and further avers that each deal contains unique factors that affect how fee splits evolve during a deal. (Resp. to DSOMF ¶ 16, ECF No. 71.)

At the outset of the agency engagement for SSI, Mr. Daniels and Powers agreed that Powers would receive 65% of the revenue credit. Powers' percentage was subsequently reduced to 50%. From Powers' perspective, Mr. Daniels forced him to agree to the reduction and thereafter began excluding Powers from the engagement. JLL, for its part, posits instead that Powers stopped responding to calls and messages relating to the deal and acted abrasively towards clients when he did respond. JLL states that the client requested that Powers' role in the deal be reduced, and that Mr. Daniels and another broker were doing most of the work on the deal.

Powers complained about his exclusion to Mr. Daniels and indicated that he wanted to be included in the Quanterix Lease Deal. Mr. Daniels then reduced Powers' revenue credit to 25%. When Powers objected, Mr. Daniels placed an additional 25% in holdback to be awarded by Mr. Barrack in arbitration. Powers asserts that Mr. Barrack was not, however, a neutral arbitrator, because he was Daniels' "friend, mentor and active partner on a project known as the 'Flower Exchange.'" (DSOMF ¶ 23.)

Mr. Daniels and Powers each provided a summary of events to Mr. Barrack via email. In response to Powers' summary, Mr. Daniels requested that Powers' credit be further reduced to 10%. Powers sent Mr. Barrack a number of emails regarding numerous purportedly false statements by Mr. Daniels respecting Powers' involvement in the engagement. Ultimately, Mr. Barrack reduced Powers' revenue credit to 10%. On December 21, 2018, JLL applied a portion of Powers' Quanterix Lease Deal commission against the balance Powers purportedly owed on the Note.

8

### H. The 2018 Potential WIT Deal

Disagreements between Powers and Mr. Daniels came to a head in late 2018, although what actually occurred remains largely disputed. Ultimately, the disputed facts are not material, although the Court sets forth each side's version of events for the sake of providing background to the parties' claims.

It is undisputed that in late 2018 JLL submitted an offer on behalf of Phase 3 Real Estate Partners ("Phase 3") to purchase property known as Sweeny Field from the Wentworth Institute of Technology ("WIT"). Powers contends that he submitted the offer on behalf of Phase 3, while JLL states that it was unclear whether Powers was working with Phase 3 or instead with WIT, because Powers had been trying to speak with WIT's President in an effort to be helpful to her. Powers maintains that both Mr. Tierney and Mr. Daniels had been aware since February 2018 that Powers was working on behalf of Phase 3.

Prior to discussions with Phase 3, JLL had held a series of meetings over the years to assist WIT in considering their real estate strategy, including discussions of Sweeney Field. Those meetings included Daniel St. Clair, an employee of SSI whose job is to identify and acquire investment opportunities for SSI. The meetings included discussions of a potential joint venture between WIT and SSI but WIT elected not to pursue it. It is disputed whether either JLL or SSI had an ongoing business relationship with WIT at the time of the Phase 3 offer.

The parties' versions of how the potential WIT Deal fell through diverge even further. JLL posits that Mr. Tierney learned of Phase 3's offer at the same time that JLL, via JLL broker Phil DeSimone, had been soliciting WIT to become engaged as WIT's strategic advisor. Mr. Tierney held a meeting with Powers and Mr. DeSimone, during which JLL maintains that

Powers' and Mr. DeSimone's efforts to leverage their respective contacts at WIT were unrelated efforts and that Mr. Tierney instructed Mr. DeSimone and Powers to keep their pursuits separate.

Powers, in contrast, contends that only after learning of the Phase 3 offer, Mr. Tierney and Mr. Daniels held the meeting and "hatched a scheme to position JLL as an advisor to WIT, with the hopes of convincing WIT to reject the Phase 3 offer and instead engage in a joint venture with SSI." (DSOMF ¶ 26.) Powers states that in furtherance of this scheme, JLL improperly directed Powers to make affirmative misrepresentations to Phase 3 and improperly directed brokers to share information with SSI "off the record" to avoid a paper trail. (*Id*.) Powers states that while Phase 3's offer (of around $90 million) initially had the support of at least two members of WIT's board, JLL's interference caused the transaction not to go through resulting in a significant loss of commission for Powers.

## I. Powers' Termination of Employment for JLL

Towards the end of 2018, Powers communicated his concerns about JLL's unethical business practices and failure to pay earned commissions to Mr. Barrack and Mr. Tierney, although JLL disputes that it engaged in unethical business practices. After that point, the parties' versions of events again diverge.

On December 12 or 13, 2018—shortly after Powers sent an email explaining his concerns to Mr. Tierney—JLL put Powers on a "Performance Improvement Plan" ("PIP"). (DSOMF ¶ 29; PSOMF ¶ 51.) Powers maintains that the PIP was put into place in retaliation for raising his concerns, but he disputes ever having received the letter outlining the PIP. Mr. Daniels testified to issuing the PIP letter "long after [Powers] had no longer been at JLL." (DSOMF ¶ 29.) According to Mr. Daniels, Powers' revenue generation was satisfactory and the reason for the

PIP was "to improve his interactions culturally at JLL." (*Id*. ¶ 30.) The PIP letter purports to address Powers' lack of responsiveness and communication. (PSOMF ¶ 51.)

JLL contends that Powers continued to fail to answer emails, phone calls, and other efforts to reach him. On January 4, 2019, JLL discontinued Powers' email. On January 15, 2019, JLL's human resources personnel forwarded Mr. Daniels a termination letter stating that since JLL had not received any reply to its letter dated January 10, 2019, concerning Powers' apparent abandonment of his position, JLL considered Powers to have "resigned from his position, effective January 15, 2019." (PSOMF ¶ 53; *id*. Ex. J.) JLL posits that Mr. Daniels offered Powers a separation agreement via voicemail, which Powers disputes.

Powers, however, avers that his discussions with Mr. Barrack regarding his concerns about JLL's business practices led to an oral agreement in which Mr. Barrack and Powers agreed to the following: "(a) Powers would refrain from working for a competitor of JLL after leaving, (b) JLL would pay Powers his anticipated commission of $468,000 for a pending MilliporeSigma transaction in Carlsbad, California ("Carlsbad Deal") in full satisfaction of his past-due commissions, and (c) JLL would deem fully satisfied all of Powers' obligations under the [Note]." (DSOMF ¶ 31.) Powers contends that his employment ended in December 2018 pursuant to this agreement, and that he has fully performed his obligations thereunder by refraining from working for a competitor. Mr. Barrack died in December 2019, and the only evidence put forth by Powers of the oral agreement is his own testimony. JLL disputes that an oral agreement was reached because such evidence is inadmissible under the Illinois Dead Man's Statute. It is undisputed that Powers never entered into a written separation agreement.

11

JLL asserts that some undefined amount remains outstanding on the Note,[3] and it is undisputed that Powers has made no monetary payments to JLL related to the Note following January 15, 2019. It is further undisputed that Powers did not submit a "Protected List" of closed and pending deals as contemplated by the Commission Plan for revenue to be credited to a broker post-termination. Powers maintains that he did not submit the Protected List in reliance on his oral agreement with Mr. Barrack. Finally, it is undisputed that Powers has not received any payment for the Carlsbad or Quanterix Lease Deals or the "deals identified on pages 12 and 13 of Defendant's Exhibit I." (*Id.* ¶¶ 33, 35.)

## II.    LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021 (7th Cir. 2018). Summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). In other words, failure to support any essential element of a claim renders all other facts immaterial. *Id.* at 323. "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir.

---

[3] JLL alleges that the balance outstanding on the Note was $268,226.77 (Compl. ¶ 13, ECF No. 1) but states in its summary judgment briefing that the amount has no bearing on liability and that it will calculate the outstanding balance once the case is decided on the merits.

2005). "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997).

## III. DISCUSSION

### A. JLL Count I – Breach of Contract

The parties dispute whether Illinois or Massachusetts law applies to JLL's breach of contract claim. There is no dispute as to the elements of a breach of contract, which are materially the same under either state's law for purposes of this motion: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *nClosures Inc. v. Block & Co.*, 770 F.3d 598, 601 (7th Cir. 2014) (Illinois law); *see also Bulwer v. Mount Aubern Hosp.*, 46 N.E.3d 24, 39 (Mass. 2016) ("To prevail on a claim for breach of contract, a plaintiff must demonstrate that there was an agreement between the parties; the agreement was supported by consideration; the plaintiff was ready, willing, and able to perform his or her part of the contract; the defendant committed a breach of the contract; and the plaintiff suffered harm as a result.").

JLL argues that that the following facts are undisputed: the parties entered into the Note, a valid contract, on June 1, 2015; JLL performed its obligations on the Note by issuing payment in the amount of $500,000 and by forgiving the balance pursuant to the terms of the Note; once Powers was terminated with "Cause," the remaining balance under the Note became due and owed; and Powers failed to repay the outstanding balance in breach of the Note. JLL does not articulate the amount it believes to be outstanding.

Powers does not dispute that he entered into the Note and that he has not made any payments on the Note since January 15, 2019. He argues instead that his oral agreement with Mr. Barrack formed a new contract that nullified the obligations of the Note and so there has been no

13

breach. As it turns out, Mr. Barrack is now deceased and the only evidence of Powers' oral agreement with Mr. Barrack is Powers' own testimony. JLL argues that such testimony is inadmissible under Illinois law, while Powers argues that Massachusetts law applies and does not bar such evidence. Before turning to the merits of JLL's motion on its own claim for breach of contract, the Court must determine whether Illinois and Massachusetts law conflict with respect to the narrower issue of the admissibility of Powers' testimony and if so, which law should apply.

### 1. The Conflict of Law

Before conducting a choice of law analysis, the Court must satisfy itself that there truly is a conflict of law. *Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893, 898 (Ill. 2007) ("A choice-of-law determination is required only when a difference in law will make a difference in the outcome."); *see also Bd. of Forensic Document Exam'rs, Inc. v. Am. Bar Ass'n,* 922 F.3d 827, 831 (7th Cir. 2019).

JLL argues that Powers' testimony is barred by Illinois law, which states in pertinent part:

> [I]n every action or proceeding a party to the same who has contracted with an agent of the adverse party—the agent having since died—shall not be a competent witness as to any admission or conversation between himself or herself and such agent, unless such admission or conversation with the deceased agent was had or made in the presence of a surviving agent or agents of such adverse party, and then only except where the conditions are such that under the provisions of Sections 8-201 and 8-401 of this Act he or she would have been permitted to testify if the deceased person had been a principal and not an agent.

735 ILCS 5/8-301.

JLL refers to Section 8-301 as the "Illinois Deadman's Act," even though the Illinois legislature gave that title to a separate section of the Illinois code. *See* 735 ILCS 5/8-201.

Nonetheless, the Seventh Circuit similarly referred to a prior, but substantially identical, version of Section 8-301 as Illinois' dead man's statute. *Lovejoy Elecs., Inc. v. O'Berto*, 873 F.2d 1001, 1005 (7th Cir. 1989).

The conflation of Section 8-201 and 8-301 appears to have infiltrated the parties' arguments. Although JLL raises only Section 8-301, Powers ignores that section entirely and argues only against the application of Section 8-201. JLL fails to point out that mistake. But Section 8-201 applies only in a suit in which the plaintiff or defendant is the "executor, administrator, heir or legatee" of a deceased person and so is not applicable in this case. 735 ILCS 5/8-201.

Returning to Section 8-301, Powers' testimony falls squarely within its confines. This is a suit "by or against a firm[,]" JLL. 735 ILCS 5/8-301. Powers intends to "testify about [a] conversation with a dead agent of the firm" with whom he purportedly contracted and there is no evidence that "a living agent of the firm was also present at the conversation[.]" *Id*. Although neither party raises the issue of whether Mr. Barrack was an agent of JLL, Powers' theory relies upon the premise that Mr. Barrack had the authority to bind JLL in the oral agreement. *See Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 672 (7th Cir. 2004) ("Agency is a fiduciary relationship in which the agent has the power to act on the principal's behalf.").

In contrast, Massachusetts law has no equivalent prohibition of evidence. *Litif v. U.S.*, 682 F. Supp. 2d 60, 66 (D. Mass. 2010), *aff'd*, 670 F.3d 39 (1st Cir. 2012), and *aff'd sub nom. Davis v. U.S.*, 670 F.3d 48 (1st Cir. 2012); *see also* Mass. Gen. Laws ch. 233, § 65 ("In any action or other civil judicial proceeding, a declaration of a deceased person shall not be inadmissible in evidence as hearsay . . . if the court finds that it was made in good faith and upon the personal knowledge of the declarant.").

In short, if Illinois law applies and bars Powers' testimony, he has no evidence of an oral contract with Mr. Barrack, upon which he relies as a defense to JLL's breach of contract claim (as well as to support his own breach of contract and Massachusetts Wage Act counterclaims). On the other hand, if Massachusetts law applies, Powers maintains his defense that the Note was nullified by the oral agreement. Because the outcome of which law applies is material to the claims at issue, there is a conflict of law as to whether Illinois or Massachusetts law governs.

### 2. Illinois Law Applies

JLL argues that Illinois law applies pursuant to the Illinois choice of law provision in the Note. *See Newell Co. v. Petersen*, 758 N.E.2d 903, 922 (Ill. App. Ct. 2001) (Restatement (Second) Conflict of Laws § 187 applies where parties have contractually chosen which law applies); Restatement (Second) Conflict of Laws § 187 (Am. L. Inst. 1971) ("[A] court should give effect to the parties' choice of law unless either" of two exceptions apply.).

Powers argues that Massachusetts law applies as the state with the most significant relationship to the oral agreement. *See Gramercy Mills, Inc. v. Wolens*, 63 F.3d 569, 572 (7th Cir. 1995) (Restatement (Second) Conflict of Laws § 188 applies where the parties have not chosen the law); Restatement (Second) Conflict of Laws § 188 (Am. L. Inst. 1971) (setting forth five factors to determine which state "has the most significant relationship to the transaction and the parties"). Powers argues that the oral agreement was negotiated and entered into in Massachusetts between an individual-citizen of Massachusetts and a corporation-citizen of Illinois and Maryland concerning the cessation of Powers' employment services performed in Massachusetts.

The parties correctly agree that in this diversity action, the Court applies the choice-of-law rules of the forum state—Illinois. *Hendricks v. Novae Corp. Underwriting, Ltd*, 868 F.3d

542, 545 (7th Cir. 2017). Beyond that point, this case presents more nuanced considerations than the parties let on.

"[I]n a civil case, state law governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 601. This case presents the unusual question of which state law governs Powers' competency to testify to the oral agreement, where it is clear that state law "supplies the rule of decision" but it is disputed as to which state. Although the parties do not meaningfully engage with Rule 601, their arguments effectively assume that the "state law" that governs "witness's competency" is the same as the "state law" that "supplies the rule of decision." *Id*. But that is not a forgone conclusion under the plain language of Rule 601, and there are few opinions that consider this issue. *See* 27 Charles Alan Wright, et al., *Federal Practice and Procedure* § 6009 (2d ed.) (noting the paucity of opinions on point and outlining the implications on principles underlying the *Erie* doctrine of various approaches a federal court could take).

In *Hortman v. Henderson*, 434 F.2d 77, 80 (7th Cir. 1970), the Seventh Circuit found that while the substantive law of Missouri controlled the wrongful death action, "the matter of competency of the witness to testify has to be determined under the rules of evidence applied in the courts of general jurisdiction of the state in which the United States court is held" and so the district court erred in permitting testimony barred by the Illinois dead man's statute. The court, however, relied upon a version of Rule 43(a) of the Federal Rules of Civil Procedure that was subsequently amended in 1972 to delete those portions "dealing with admissibility of evidence and competency of witnesses" in light of the enactment of the Rules of Evidence. Fed. R. Civ. P. 43 advisory committee's note to 1972 amendment.

17

Although *Hortman* relied upon a portion of Rule 43(a) no longer in existence, it is nonetheless instructive in that it treats Illinois' dead man's statute as falling under the umbrella of competency of witnesses and as procedural in nature. This approach is consistent with a more recent Seventh Circuit opinion (albeit not considering any conflict of law issue) and persuasive authority. *See Lovejoy*, 873 F.2d at 1005 ("The legislative history of Rule 601 reveals that the purpose of this exception was, precisely, to preserve state dead man's laws in cases such as this where state law supplies the rule of decision."); Fed. R. Evid. 601 advisory committee note to 1974 enactment ("Acknowledging that there is substantial disagreement as to the merit of Dead Man's Statutes, the Committee nevertheless believed that where such statutes have been enacted they represent State policy which should not be overturned in the absence of a compelling federal interest. The Committee therefore amended the Rule to make competency in civil actions determinable in accordance with State law with respect to elements of claims or defenses as to which State law supplies the rule of decision."); *Est. of Aguirre ex rel. Aguirre v. Koruga*, 42 F. App'x 73, 75 (9th Cir. 2002); *Equitable Life Assurance Soc'y of the U.S. v. McKay*, 861 F.2d 221, 223 (9th Cir. 1988).

In Illinois, "[t]raditional conflict principles prescribe that issues of clearly procedural nature are governed by the internal laws of the forum, whereas substantive matters are controlled by the laws of the State where the transaction occurred." *People v. Saiken*, 275 N.E.2d 381, 385 (Ill. 1971). Here, for the reasons described above, the competency of witnesses, including Section 8-301, is procedural in nature and thus is governed by the law of the forum state—Illinois. *Cf. Est. of Aguirre ex rel. Aguirre*, 42 F. App'x at 76 (applying Washington dead man's statute as law of forum state, rather than the Philippine dead man's statute); *Equitable Life Assurance Soc'y*, 861 F.2d at 222-23 (applying Oregon law, rather than the Washington dead

man's statute, in a case filed in Oregon in which Washington substantive law controlled). For the reasons stated above, Section 8-301 applies here to bar Powers' testimony of any oral agreement with Mr. Barrack.

### 3. Questions of Fact Remain as to Whether Powers' Affirmative Defense Excused His Nonperformance of the Note

The Court next considers JLL's breach of contract claim in light of the Court's decision that Powers points to no admissible evidence that the Note was nullified. To reiterate, it is undisputed that the parties entered into the Note on June 1, 2015, and JLL at least partially performed its obligations on the Note by issuing payment in the amount of $500,000. JLL argues—and Powers disputes—that it further performed its obligations on the Note by forgiving the balance pursuant to the terms of the Note, and that once Powers was terminated with "Cause," the remaining (undefined) balance became due and owed yet Powers failed to repay in breach of the Note.

JLL points to no evidence that it terminated Powers' employment with "Cause." The only evidence offered by JLL as to the nature of Powers' employment cessation is that it considered Powers to have abandoned his position and to have "resigned from his position, effective January 15, 2019." (PSOMF ¶ 53; *id*. Ex. J.) Powers, for his part, contends that his employment ended sometime in December 2018, and offers no admissible evidence as to the manner in which his employment ended. The only evidence thus before the Court is that Powers resigned effective January 15, 2019, at which time the balance remaining on the Note became due and payable pursuant to its terms. (PSOMF ¶ 14.) It is undisputed that Powers has made no payments on the outstanding balance of the Note since at least January 15, 2019.

Powers argues that there are issues of fact as to what, if any, amount remains due on the Note, which requires determining whether JLL failed to recognize attributable revenue earned by

Powers in the Quanterix Lease Deal and Carlsbad Deals. For the reasons stated below, *infra* Section III.B.a. and b., Powers fails to show JLL breached any obligation to Powers with respect to revenue credit and commission on those two Deals.

Finally, Powers argues—citing Illinois law—that his affirmative defense that JLL violated the implied covenant of good faith and fair dealing precludes summary judgment. JLL responds that no issues of fact respecting Powers' affirmative defenses do anything to dispute the fact that Powers did not repay the remaining balance on his Note. JLL cites to no authority and does not address the authority cited by Powers. Neither party identifies a conflict of law on this issue, and so the Court applies Illinois law. *Bd. of Forensic Document Exam'rs*, 922 F.3d at 831 ("If the party fails to establish the existence of . . . a conflict, the court applies the law of the forum state." (quoting *W. Side Salvage, Inc. v. RSUI Indem. Co.*, 878 F.3d 219, 223 (7th Cir. 2017) (internal quotation marks omitted))).

Under Illinois law, "the duty of good faith and fair dealing requires a party vested with contractual discretion to exercise it reasonably, not 'arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectation of the parties.'" *Am. Nat. Bank & Tr. Co. of Chi. v. Allmerica Fin. Life Ins. & Annuity Co.*, 304 F. Supp. 2d 1009, 1016 (N.D. Ill. 2003) (quoting *Diamond v. United Food & Commercial Workers Union Local 881*, 768 N.E.2d 865, 871 (Ill. 2002)). Powers specifically argues that Mr. Daniels' "deceitful efforts to cut Powers out of the Quanterix [Lease Deal], JLL's duplicitous actions in connection with the Phase 3 offer, and the retaliatory issuance of a baseless [PIP]" violated the implied covenant of good faith and fair dealing. (Def. Resp. Mem. at 12, ECF No. 69.) The thrust of Powers' argument appears to be that such a breach, if deemed material by a factfinder, excused his obligations under the Note.

Powers is less than forthcoming about which of the various contracts at issue in this case he contends JLL to have breached. Powers points in part to JLL's exercise of discretion respecting Powers' compensation, which falls under the purview of Powers' Employment Agreement (which in turn promises to pay commissions consistent with the Compensation Plan). But Powers does not address whether a breach of the Employment Agreement by JLL would excuse Powers from performance under the Note.

Per the Note's terms, JLL agreed "to make this loan to [Powers] subject to the conditions . . . contained in the [Employment] Agreement." (Compl. Ex. A, ECF No. 1-1.) Under Illinois law, "[t]he party seeking to enforce the terms of an allegedly incorporated document 'must show . . . an intention to incorporate the document and make it a part of the contract.'" *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 736-37 (7th Cir. 2002) (quoting *Arneson v. Bd. of Trs., McKendree Coll.,* 569 N.E.2d 252, 256 (Ill. 1991)). "When the contract incorporates a specific document by name, both parties are on notice and are bound by the terms of that document." *Id*. at 737 (citations omitted). The Seventh Circuit noted in dicta that the statement, "Sales of all services and materials are subject to the general terms and conditions on the reverse side[,]" is an "incorporation clause." *Id*; *see also D&B II Enters. LLC v. Universal Tax Sys., Inc.*, No. 13 C 5702, 2018 WL 1561727, at *7 (N.D. Ill. Mar. 31, 2018) (finding the term "subject to" showed intent to incorporate as a matter of law). Here, the conditions of the Employment Agreement were incorporated into the Note, and so a breach of those conditions could constitute a breach of the Note.

But the Court's inquiry does not end there. "It is black letter law in Illinois and elsewhere that only a 'material' breach of a contract provision by one party will justify non-performance by the other party." *Sahadi v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.*, 706 F.2d 193, 196 (7th Cir.

21

1983); *see also Mohanty v. St. John Heart Clinic, S.C.*, 866 N.E.2d 85, 95 (Ill. 2006). "[T]he determination of 'materiality' is a complicated question of fact, involving an inquiry into such matters as whether the breach worked to defeat the bargained-for objective of the parties or caused disproportionate prejudice to the non-breaching party, whether custom and usage considers such a breach to be material, and whether the allowance of reciprocal non-performance by the non-breaching party will result in his accrual of an unreasonable or unfair advantage." *Sahadi*, 706 F.2d at 196. Because these issues "must be resolved with reference to the intent of the parties as evidenced in large part by the full circumstances of the transaction," they are "especially unsuited to resolution by summary judgment." *Id.* (reversing summary judgment). Here, whether JLL breached the implied covenant of good faith and fair dealing, and whether that breach is material and so excused Powers' nonpayment under the Note, are questions of fact that preclude summary judgment.

Accordingly, summary judgment is denied on JLL's breach of contract claim.

### B. Powers Counterclaim Count II – Breach of Contract

Powers' counterclaim and response to the instant motion are again not models of clarity as to which agreements he contends JLL to have breached. For ease of reference the Court addresses each commission to which Powers argues he is entitled under various purported agreements.

#### a. Carlsbad Deal Commission

Powers' claim that JLL breached an oral agreement between Mr. Barrack and Powers fails for the reasons set forth above—Powers provides no admissible evidence of any such oral agreement. This is the sole basis upon which Powers claims he is owed any commission for the

Carlsbad Deal. Accordingly, JLL's motion for summary judgment is granted in this limited respect.

### b. Quanterix Lease Deal Commission

Powers next argues that JLL breached an agreement between Powers and Mr. Daniels whereby they agreed that Powers would receive a 50% share of the revenue credit on the Quanterix Lease Deal. Powers argues JLL's Compensation Plan specifically authorizes brokers to enter into such agreements, and that Mr. Daniels "reneged on his agreement . . . only as the deal was wrapping up." (Def. Resp. Mem. at 13, ECF No. 69.)

JLL argues that pursuant to the Compensation Plan, such fee split agreements can be reduced, modified, or changed based on a broker's actual participation on a deal. JLL further argues that the specifics of the deal are irrelevant, because Powers' commission was determined in accordance with JLL's established guidelines and Powers was paid his share of the commission. JLL does not support its argument that Powers was paid his share of the commission with citations to any evidence, however, and indeed it is undisputed that JLL applied a portion of Powers' Quanterix Lease Deal commission—based upon a reduced revenue credit— to the amount purportedly outstanding on the Note.

The parties do not fully address the issues at play here, including which agreement JLL purportedly breached by not awarding 50% revenue credit on the Quanterix Lease Deal and which law applies. Pursuant to Powers' Employment Agreement, JLL promised to "pay [Powers] commissions consistent with the Comp[ensation] Plan[.]" (Compl. Ex. B at Ex. A, ECF No. 1-2.) The Employment Agreement states that it is governed by Massachusetts law, while the Compensation Plan has no governing law provision. Powers cites to Massachusetts law, which

23

JLL does not dispute. In light of apparent agreement by the parties, the Court applies

Massachusetts law.[4]

"When interpreting a contract, courts must assess whether the contract at issue . . . is

ambiguous, . . . a question of law in Massachusetts[.]" *Barclays Bank PLC v. Poynter*, 710 F.3d

16, 21 (1st Cir. 2013) (citations omitted). "To answer the ambiguity question, the court must first

examine the language of the contract by itself, independent of extrinsic evidence concerning the

drafting history or the intention of the parties." *Bank v. Thermo Elemental Inc.*, 888 N.E.2d 897,

907 (Mass. 2008). "'Contract language is ambiguous where the phraseology can support a

reasonable difference of opinion as to the meaning of the words employed and the obligations

undertaken.'" *Id.* (quoting *President & Fellows of Harvard Coll. v. PECO Energy Co.*, 787

N.E.2d 595, 601 (Mass. App. Ct. 2003)). "Summary judgment is appropriate when the contract's

plain terms unambiguously favor either side." *Barclays Bank*, 710 F. 3d at 21.

The Court finds that the terms of the Compensation Plan are unambiguous. The

Compensation Plan contemplates that revenue credit is based upon a broker's "participation in

generating the revenue," which is "determined by agreement of the team members for the

transaction generating the revenue, subject to modification and approval by Markets Leadership

to ensure reasonable and equitable distribution." (PSOMF Ex. E ¶ 1(c).) Those statements—the

main focus of the parties' arguments—when viewed in isolation do not expressly set forth when

during a deal an agreement over revenue credit is final. But in the context of the provision as a

whole, it is plain that the determination of a broker's revenue credit is not final until JLL receives

the revenue fee from the client after the deal closes: "Revenue credit is recognizable for the

---

[4] While JLL supports its arguments by citing to Seventh Circuit law setting forth the summary
judgment standard, JLL cites to no law on the substantive issues.

purpose of commission calculations once JLL receives the revenue fee, provided there is documentation consistent with the Company's regular practices to allow for recognition of the revenue. Broker does not earn a commission, and JLL has no liability for payment, unless and until JLL receives the fees for the respective transactions." (*Id.*) Powers' argument that Mr. Daniels entered into an agreement at the beginning of the Quanterix Lease Deal and then reneged only as the Deal was wrapping up is not supported by the unambiguous language of the Compensation Plan.

Finally, Powers does not argue that JLL's application of a portion of the Quanterix Lease Deal commission towards the outstanding balance of the Note constituted a breach of any contract. The Court will not decide arguments not pursued by the parties, which are deemed waived. *U.S. v. 47 W. 644 Route 38, Maple Park, Ill.*, 190 F.3d 781, 783 (7th Cir. 1999).

Accordingly, the evidence presented by Powers fails to establish a breach of contract by JLL for not paying commission based on 50% revenue credit on the Quanterix Lease Deal.

### c. Commission for Post-Termination Deals

Finally, Powers argues that he is entitled to commission on "various deals that closed in the year after his separation." (Def. Resp. Mem. at 13, ECF No. 69.) Only slightly more specifically, Powers points the Court generally to the "deals identified on pages 12 and 13 of Defendant's Exhibit I." (DSOMF ¶ 35.) Powers is largely silent as to any factual or contractual basis for this claimed entitlement.

Pages 12 and 13 of Powers' Exhibit I purport to be a "2019 Commission Report" for Powers generated by JLL. (*Id.* Ex. I at 12-13.) Powers does not explain, nor point the Court to any evidence that would explain, the meaning of the information on the document. There are 17 unique "Deal ID's" listed, ten of which state "0.00" in the "Total Cash Collected" column and

the "Broker Alloc of Cash Collected" column. Under the Compensation Plan, Powers "does not earn a commission, and JLL has no liability for payment, unless and until JLL receives the fees for the respective transactions." (PSOMF Ex. E ¶ 1(c).) Powers submits no evidence that JLL received any fees for these ten post-termination deals. Because Powers fails to provide evidence of JLL's obligation to pay him commission for these ten deals—an essential element of his counterclaim for which he carries the burden—there can be no breach of contract.

That leaves seven deals that list positive values in the "Total Cash Collected" column and "Broker Alloc of Cash Collected" columns: (1) "Millipore Sigma [*sic*] Madison"; (2) "Quanterix Corporation – 900 Middlesex Turnpike – Building 1"; (3) "EMD Millipore – Sublease from Vievu"; (4) "Dartmouth Group – 4 Preston Court"; (5) "Diversified Technologies – 4 Preston Court"; (6) "MilliporeSigma (Natrix Separations) – Ontario, Quebec, Canada"; and (7) "Life Technologies (aka Thermo Fisher) – 4 Preston Court (LR)." The "Broker Alloc of Cash Collected" column totals $77,555.24. Although JLL argues that Powers has not submitted financial data to support that he was not paid these commissions, Powers submits his unrebutted declaration that he has received no commission payments since at least January 15, 2019.

JLL next argues that pursuant to the Compensation Plan, Powers had to create a Protected List and designate deals he worked on in order to receive the commissions. As the argument goes, because Powers never created a Protected List, he is not entitled to any of the commissions on those deals. In anticipation of JLL's response, Powers argues that it is for the factfinder to determine whether that obligation was not material and therefore does not excuse JLL from its obligation to pay. JLL fails to respond to this argument. Neither party cites any authority in support.

"A breach of a contract is a material breach when it involves 'an essential and inducing feature of the contract.'" *EventMonitor, Inc. v. Leness*, 44 N.E.3d 848, 853 (Mass. 2016) (quoting *Anthony's Pier Four, Inc. v. HBC Assocs.*, 583 N.E.2d 806, 819 (Mass. 1991)). "Whether a party has committed a material breach ordinarily is a question of fact." *Id.* (citations omitted). "But if 'the evidence on the point is either undisputed or sufficiently lopsided . . . the court must intervene and address what is ordinarily a factual question as a question of law.'" *Id.* at 854 (quoting *Teragram Corp. v. Marketwatch.com, Inc.*, 444 F.3d 1, 11 (1st Cir. 2006)).

For example, the Supreme Judicial Court of Massachusetts found that the "essential purpose" of a confidentiality provision in an employment agreement is "to protect the confidentiality of [the company's] proprietary information" and a breach "therefore becomes material if it undermines that confidentiality." *Id.* Because there was no evidence that the employee had disclosed confidential information, his breach was immaterial and did not entitle the company to stop making severance payments. *Id.* at 855.

Here, the "essential and inducing feature" of the "Post-Termination Protected Transactions" provision of the Compensation Plan is to set forth JLL's payment obligations with respect to transactions that are closed before a broker's termination date and those that remain pending as of such date. To kick-start that process, a broker first provides a proposed "Protected List" of "any deferred log and any deals in process" for which the broker claims credit. (PSOMF Ex. E ¶ 2(a).) Here, JLL appears to have already electronically generated a list that serves the same purpose. The Court cannot say that the evidence is "undisputed or sufficiently lopsided" to justify its intervention by addressing a factual question as a question of law. Whether or not Powers' failure to generate a "Protected List" was a material breach that justified JLL's

27

nonpayment for those seven deals is thus a question of fact that precludes summary judgment in this limited respect.

### C. Powers' Counterclaim Count I – Massachusetts Wage Act

JLL argues that it is entitled to summary judgment on Powers' Massachusetts Wage Act ("Wage Act") claim. Powers argues that the facts establish three distinct Wage Act violations, addressed in turn below. The parties agree that Massachusetts law applies.

#### a. Nonpayment of Commissions

Powers first argues that JLL has violated the Wage Act by failing to timely pay Powers duly earned commissions. In opposition, JLL reiterates its arguments with respect to Powers' counterclaim for breach of contract.

The Wage Act requires employers to pay to an employee "the wages earned by him" within a certain amount of time depending on the nature of the employment. Mass. Gen. Laws ch. 149, § 148. That requirement applies "to the payment of commissions when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employee, and commissions so determined and due such employees shall be subject to the provisions of section one hundred and fifty." *Id*. The term "earn" is not defined, "but it is commonly understood to mean '[t]o acquire by labor, service, or performance.'" *Fraelick v. PerkettPR, Inc.*, 989 N.E.2d 517, 521 (Mass. 2013) (quoting *Awuah v. Coverall N. Am., Inc.,* 952 N.E.2d 890, 896 (Mass. 2011)).

For the reasons set forth above with respect to Powers' counterclaim for breach of contract for failure to pay seven post-termination commissions, there remain questions of material fact as to whether JLL owes those commissions to Powers. Because there are thus

questions as to whether those seven post-termination commissions have "become due and payable" to Powers, summary judgment is not appropriate in this respect.

However, Powers fails to establish entitlement to the Carlsbad and Quanterix Lease Deal commissions, as well as the ten post-termination commissions for which no fees have been collected by JLL, for the reasons stated above. Summary judgment is granted in JLL's favor in this limited respect.

### b. Retaliation

Powers next argues that JLL retaliated against Powers for his complaints regarding JLL's failures to pay his commissions. The Wage Act states, "No employee shall be penalized by an employer in any way as a result of any action on the part of an employee to seek his or her rights under the wages and hours provisions of this chapter." Mass. Gen. Laws ch. 149, § 148A. "This is, in effect, a stiff antiretaliation law, which is strictly applied for the protection of employees who suffer adverse employment consequences for engaging in protected activity." *Fraelick*, 989 N.E.2d at 522. Further, the viability of a retaliation claim "does not depend on the success of the underlying" claim for wages. *Smith v. Winter Place LLC*, 851 N.E.2d 417, 419 n.4 (Mass. 2006).

JLL argues in part that there is no evidence Powers raised complaints against Mr. Daniels or JLL, either internally or externally, related to his compensation or JLL's practices generally. JLL points out that Powers has made no official complaints to the Greater Boston Real Estate Board, or any authorities with jurisdiction, regarding JLL. JLL contends that discussions about fee splits do not constitute complaints under the Wage Act because they were part of JLL's formal and informal business practices and further points out that Powers did not cite any specific provision of the Real Estate Code in his conversations with Mr. Barrack. JLL cites no authority in support.

Powers, on the other hand, argues that protection under the Wage Act is not limited to formal complaints. Powers specifically argues that a reasonable factfinder could conclude that after Powers raised his objections to Mr. Daniel's efforts to deprive him of the full commission he had earned on the Portfolio Sale, Mr. Daniels retaliated by pushing Powers out of the Quanterix Lease Deal and reducing his revenue credit from 65% to 25%. Then when Powers complained of that retaliation and sought to have his credit restored by Mr. Barrack, Mr. Daniels reduced Powers' commission to just 10%.

Under Massachusetts law, "'[a] complaint made to an employer (or a manager of the employer) by an employee who reasonably believes that the wages he or she has been paid violate such laws readily qualifies as such [a protected] action.'" *Fraelick*, 989 N.E.2d at 522 (quoting *Smith*, 851 N.E.2d at 421). The Court cannot say that Powers fails to provide any evidence of his retaliation claim. It is for a factfinder to determine whether Powers "reasonably perceived" he had earned and was owed more commission on the Portfolio Sale than was paid to him, whether Powers' communications to JLL in that regard constituted complaints or other protected activity under the Wage Act, and whether Mr. Daniels retaliated by pushing Powers out of the Quanterix Lease Deal and reducing his revenue credit from 65% to 25% and ultimately to 10%. Summary judgement is therefore denied in this respect.

### c. Setoff

Finally, Powers argues that JLL performed an unlawful setoff when it applied a portion of Powers' commission on the Quanterix Lease Deal to the outstanding balance of the Note without due process.

Under the Wage Act, an employer may not excuse failure to pay commissions as required "other than the attachment of such wages by . . . a valid set-off against the same," among other

expressly delineated reasons that are not at issue here. Mass. Gen. Laws ch. 149, § 150. While the term "set-off" is not defined in the Wage Act, "[a] setoff is generally defined as 'something that is set off against another thing [;] ... the discharge of a debt by setting against it a distinct claim in favor of the debtor.'" *Camara v. Att'y Gen.*, 941 N.E.2d 1118, 1121 n. 7 (Mass. 2011) (quoting Webster's Third New International Dictionary 2078 (1993)). The Supreme Judicial Court of Massachusetts held that a "valid set-off" "refer[s] to circumstances where there exists a clear and established debt owed to the employer by the employee." *Somers v. Converged Access, Inc.*, 911 N.E.2d 739, 750 (Mass. 2009).

Powers cites to *Camara* in support of his argument that he was entitled to "due process" before JLL could apply a setoff on his Quanterix Lease Deal commission. There, the Supreme Judicial Court of Massachusetts found that "[a]n arrangement whereby [the employer] serves as the sole arbiter, making a unilateral assessment of liability as well as amount of damages with no role for an independent decision maker, much less a court, and, apparently, not even an opportunity for an employee to challenge the result within the company, does not amount to 'a clear and established debt owed to the employer by the employee.'" *Camara*, 941 N.E.2d at 1124 (quoting *Somers*, 911 N.E.2d at 750).

One example of a "valid set-off" offered by the Attorney General in that case, noted in dicta by the court, was "proof of an undisputed loan or wage advance from the employer to the employee[.]" *Id*. at 1124 n.13. JLL argues that the Note, which included a provision that specifically allows setoffs, was an "undisputed loan" and so a clear and established debt for which no due process was owed under *Camara*. Powers counters that the Note did not constitute an "undisputed loan" because Powers believed the Note had been deemed fully satisfied based

on his oral agreement with Mr. Barrack. For the reasons stated above, however, Powers offers no admissible evidence of an oral agreement with Mr. Barrack.

Powers also argues that the Note is not an "undisputed loan" because it would only have become due and payable if there was "Cause" for Powers' termination. JLL makes no response to this argument, although the issue is more complex than Powers lets on. For the reasons stated above, the only admissible evidence before the Court is that JLL considered Powers to have abandoned his position and "resigned" effective January 15, 2019. Under the terms of the Note, the outstanding balance of the Note became due and payable upon Powers' resignation. It is undisputed that Powers has made no payments towards that balance since that date. Nonetheless, for the reasons stated above with respect to JLL's breach of contract claim, there remain questions of material fact on Powers' affirmative defense that may excuse his nonperformance of the Note. Accordingly, the Court cannot determine as a matter of law that the Note was an "undisputed loan" or that Powers owed to JLL "a clear and established debt" thereunder, *Somers*, 911 N.E.2d at 750, and so need not decide whether "due process" was owed. If Powers was not obligated to repay the outstanding balance on the Note, then JLL's application of a portion of Powers' Quanterix Lease Deal commission against the balance of the Note would not constitute a "valid set-off" under the Wage Act. Summary judgment is denied in this limited respect.

### D.  Powers' Counterclaim Count III – Tortious Interference

The parties dispute whether Massachusetts or Illinois law governs Powers' counterclaim for tortious interference, but they do not truly address whether there is a conflict of law. Indeed, JLL argues that Powers' claim fails under either law. The Court agrees.

Under Illinois law, "[a] plaintiff claiming intentional interference with a prospective economic advantage must establish (1) a reasonable expectation of entering into a valid business

32

relationship, (2) the defendant's knowledge of the expectation, (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship, and (4) damage to the plaintiff resulting from the defendant's interference." *Atanus v. Am. Airlines, Inc.*, 932 N.E.2d 1044, 1048 (Ill. App. Ct. 2010). Similarly, under Massachusetts law, "a plaintiff must prove that (1) he had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." *Blackstone v. Cashman*, 860 N.E.2d 7, 12-13 (Mass. 2007).

Powers argues that he had an "advantageous relationship" with Phase 3, and that JLL was aware of that relationship and chose to interfere through the use of "improper means" (misrepresentations to Phase 3 and WIT) in the hopes that it could drive the Sweeney Field sale to SSI. The Court discerns no material difference between Illinois and Massachusetts law with respect to this claim—under either law, Powers' claim fails because an entity cannot be liable for interference in its own affairs. *See Heiman v. Bimbo Foods Bakeries Distribution Co.*, 902 F.3d 715, 720 (7th Cir. 2018) ("[U]nder Illinois law, as is true in most states, 'a party cannot tortiously interfere with its own contract,' nor can it tortiously interfere with any business expectancies created by that contract." (quoting *Bass v. SMG, Inc.*, 765 N.E.2d 1079, 1089 (Ill. App. Ct. 2002))); *Bass*, 765 N.E.2d at 1090 (Under Illinois law, "[t]he tortfeasor must be a third party to the contractual or expectancy relationship."); *Hunneman Real Est. Corp. v. Norwood Realty, Inc.*, 765 N.E.2d 800, 807 (Mass. App. Ct. 2002) ("Hunneman's claim, therefore, is 'subject to the embarrassment' that it essentially alleged that the Phillipses interfered with their own affairs, an activity which carries no liability" under Massachusetts law. (quoting *Saint Louis*

*v. Baystate Med. Ctr., Inc.*, 568 N.E.2d 1181, 1188 (Mass. App. Ct. 1991)); *Caulder v. Pollack*, No. 1984CV01905DBLS1, 2020 WL 2197871, at *1 (Mass. Super. Feb. 4, 2020) (Under Massachusetts law, "plaintiffs cannot bring a claim against the defendant, Barry Pollack, for tortiously interfering with his own affairs.").

Even assuming Powers had an advantageous relationship, or a reasonable expectation of entering into a valid business relationship, with Phase 3, the undisputed facts establish that JLL was no stranger to that relationship. There is no evidence that Powers performed his broker services on that potential deal in any capacity other than as an employee of JLL. If Phase 3 had closed the deal with WIT, Powers would not have been entitled to any commission other than through his employment with JLL, as set forth in the governing contractual agreements between Powers and JLL. All revenue from the deal would belong to JLL pursuant to the Employment Agreement, which states, "revenue for any and all commercial real estate activities in which Employee is involved . . . belong to [JLL] and [Powers] will be paid [Powers'] share consistent with this Agreement." (PSOMF ¶ 20 (quoting Compl. Ex. B ¶ 2, ECF No. 1-2).) JLL's obligation to pay Powers' commission would only have arisen once JLL collected the revenue from the client. (*Id*. Ex. E ¶ 1(c) ("Revenue credit is recognizable for the purpose of commission calculations once JLL receives the revenue fee, provided there is documentation consistent with [JLL's] regular practices to allow for recognition of the revenue. Broker does not earn a commission, and JLL has no liability for payment, unless and until JLL receives the fees for the respective transactions.").) Powers would have had no right to collect fees from the client himself. (*Id*. Ex. E ¶ 3 ("JLL shall have the sole right to pursue collection of any fees from all clients, and in no event shall Broker have the right to take any legal action for collection of such fees against any client.").)

At bottom, Powers' tortious interference claim is premised on JLL interfering in its own potential business relations and so fails as a matter of law. Summary judgment is therefore granted in JLL's favor on this claim.

## IV. CONCLUSION

JLL's motion for summary judgment [59] is denied in part because there remain questions of material fact that preclude summary judgment on: JLL's breach of contract claim; Powers' breach of contract counterclaim respecting the seven post-termination commissions for which fees have been collected by JLL; and Powers' Wage Act counterclaim respecting those seven post-termination commissions, retaliation, and setoff. Summary judgment is granted in part in JLL's favor on Powers' counterclaim for tortious interference and his breach of contract and Wage Act counterclaims respecting the Carlsbad Deal and Quanterix Lease Deal commissions and the ten post-termination commissions for which no fees have been collected by JLL.

**SO ORDERED.**                                     **ENTERED: March 31, 2023**

**HON. JORGE ALONSO**
**United States District Judge**